UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL SCHLAEPFER,

                Plaintiff,

        -v.-

CITY OF NEW YORK; NEW YORK POLICE
DEPARTMENT; MATHEW JOHN, *in his official
capacity as a Police Officer with the New York
Police Department*; JOHN DOES 1-10, *fictitious
names, sued in their official capacity as law
enforcement officers with the New York Police
Department*; MAXIMILLIAN ZAPATA; PATRICK
CHERRY; and MAVIS GARCIA,

                Defendants.

20 Civ. 3339 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Daniel Schlaepfer seeks damages from a late-night encounter

with law enforcement officers outside of a Manhattan nightclub.  Now before

the Court is a motion for summary judgment filed by Defendants City of New

York (the "City"); Police Officers Mathew John, Maximillian Zapata, and Mavis

Garcia of the New York City Police Department (the "NYPD"); and NYPD

Sergeant Patrick Cherry (together with John and Zapata, the "Officers," and all

together with the City, "Defendants").  For the reasons that follow, the Court

grants Defendants' motion for summary judgment with respect to Plaintiff's

federal and state civil rights claims, and declines to exercise supplemental

jurisdiction over his remaining state law claims.

# BACKGROUND[1]

## A.    Factual Background

The following facts are undisputed, unless specified otherwise.  On June 2, 2019, Plaintiff and his wife, non-party Vanessa Rosario, visited New York City from their home in Toronto.  (Def. 56.1 Reply ¶¶ 5, 7).  That evening, the couple met friends for a glass of champagne at the rooftop lounge of the Peninsula Hotel, then accompanied their friends to dinner, where they each had approximately two glasses of wine.  (*Id.* at ¶¶ 8-9).  After leaving dinner, Plaintiff, his wife, and their two friends visited LAVO Italian Restaurant and

---

[1]    This Opinion draws its facts from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #59)); Plaintiff's Response and Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 (Dkt. #67); and Defendants' Response to Plaintiff's Response and Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1 Reply" (Dkt. #71)).  In violation of Local Rule 56.1, Plaintiff restarts at number 1 his list of material facts as to which he contends there exists a genuine issue for trial.  For this reason, the Court will use "Pl. 56.1 Reply" to refer to Plaintiff's counterstated facts and "Pl. 56.1" to refer to Plaintiff's additional proffered disputed facts.  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.

The Court also considers the exhibits attached to the Declaration of Steve Stavridis in support of Defendants' motion for summary judgment ("Stavridis Decl." (Dkt. #61)), including the misdemeanor complaint filed in the Criminal Court of the City of New York, County of New York on June 3, 2019 ("Crim. Compl." (*id.*, Ex. E)), the transcript of Plaintiff's deposition ("Pl. Dep." (*id.*, Ex. H)), the transcript of the deposition of Defendant John ("John Dep." (*id.*, Ex. J), the transcript of the deposition of Defendant Cherry ("Cherry Dep." (*id.*, Ex. O)), and the body-worn camera ("BWC") footage obtained from non-party NYPD Officers Daniel Morogiello ("Morogiello BWC" (*id.*, Ex. K)) and Bringle ("Bringle BWC" (*id.*, Ex. L)); as well as the exhibits attached to the Declaration of Joel Silberman in opposition to Defendants' motion for summary judgment ("Silberman Decl." (Dkt. #67)), including the video footage from the nightclub's exterior security camera ("LAVO Video" (Silberman Decl., Ex. 6)).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion for summary judgment as "Def. Br." (Dkt. #60); to Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment as "Pl. Opp." (Dkt. #66); and to Defendants' reply memorandum of law in further support of their motion for summary judgment as "Def. Reply" (Dkt. #70).

Nightclub ("LAVO"), located at 40 East 58th Street, New York, New York. (*Id.* at ¶ 10). The nightclub located on the ground floor of the building was not yet open when the group arrived, so they waited in the restaurant on the second floor. (*Id.*). As they waited, Plaintiff consumed three additional alcoholic beverages. (*Id.*).

At some point between 11:00 p.m. and 11:30 p.m., the nightclub on the ground floor opened and Plaintiff's group proceeded downstairs, where they were seated at a private table that Plaintiff had reserved. (Def. 56.1 Reply ¶ 11). Plaintiff recalls that he ordered three bottles of champagne and two bottles of vodka for the table, and that he consumed multiple glasses of champagne from the time of his arrival at the nightclub, between 11:00 p.m. and 11:30 p.m., to the time of his departure, at approximately 3:45 a.m. (*Id.* at ¶¶ 12-13, 24).[2]

At approximately 3:00 a.m., two women unknown to Plaintiff's group approached Plaintiff's table and helped themselves to champagne without the consent of Plaintiff or his companions. (Def. 56.1 Reply ¶ 15). Thereafter, according to Plaintiff and his wife, one of the women attempted to steal Ms. Rosario's handbag from a bench, but one of Plaintiff's friends stopped her from

---

[2]     When asked in his deposition how many glasses of champagne he consumed "throughout the course of the night," Plaintiff testified that he consumed approximately ten glasses of champagne. (Pl. Dep. 66:16-67:18). Defendants argue that Plaintiff's answer means Plaintiff consumed ten glasses of champagne *after* being seated at his private table in the nightclub (Def. 56.1 Reply ¶ 13), while Plaintiff estimates that he consumed four glasses of champagne while in the nightclub and the rest prior to his arrival (Pl. 56.1 Reply ¶ 13).

doing so.  (*Id.*).  Plaintiff alerted LAVO security guards, who evicted the two women from the nightclub.  (*Id.* at ¶ 16).  At the time the women were evicted from LAVO, approximately ten NYPD officers were situated outside of the nightclub to assist with crowd control resulting from celebrity appearances from Cardi B. and the Migos Twins at LAVO that night.  (*Id.* at ¶ 17).  Once outside, one of the women (identified as "Alexa I."[3]) approached some of the nearby officers, including Officer John and Sergeant Cherry, to complain that she had been assaulted inside the nightclub.  (*Id.* at ¶¶ 19-20; Morogiello BWC, at 3:30 a.m. to 3:45 a.m.).

In particular, Alexa alleged that a female inside the club, later identified as Plaintiff's wife, physically assaulted her by pushing and throwing her down. (Def. 56.1 Reply ¶ 20).  Alexa further claimed that despite being the victim of this incident, LAVO security guards had evicted her and her friend.  (*Id.* at ¶ 21).  Alexa wanted the officers to arrest Ms. Rosario and demanded that they enter LAVO to review surveillance video in order to corroborate her complaint. (*Id.*).  Neither Officer John nor Sergeant Cherry noticed any sign of injury consistent with Alexa's complaint.  (Pl. 56.1 Reply ¶ 19; John Dep. 55:1-14; Cherry Dep. 33:1-7).  The Officers took no action on Alexa's complaint other than to take a report.  (Def. 56.1 Reply ¶ 22).  After lodging her complaint, Alexa and her friend remained standing outside LAVO adjacent to the entrance. (*Id.* at ¶ 23).

---

[3]     Alexa I.'s full name is withheld for confidentiality purposes.

At approximately 3:45 a.m., Plaintiff and Ms. Rosario exited LAVO and proceeded to walk east on 58th Street.  (Def. 56.1 Reply ¶ 24 (describing the couple as "intoxicated"); Pl. Dep. 92:10-93:18 (Plaintiff describing himself as steady on his feet but not "perfectly sober," and describing his wife as steady on her feet but "appear[ing] intoxicated")).  As the pair walked past Alexa and her companion, the two women pointed to Ms. Rosario and shouted to the NYPD officers present, "It's her, it's her … this is the girl … arrest this girl!"  (Def. 56.1 Reply ¶ 26 (quoting Morogiello BWC at 3:46:10-15)).  Alexa approached Ms. Rosario while pointing at her face, and Ms. Rosario swatted Alexa's hand away before turning to face the two women.  (*Id.* at ¶¶ 27-28; Morogiello BWC at 3:46:18-3:46:35).  The three women began shouting at each other, drawing the attention of others outside LAVO.  (*Id.*).  Officer John then stepped between the women to prevent the argument from escalating further, while Officer Morogiello grabbed Ms. Rosario's right arm.  (Def. 56.1 Reply ¶¶ 29-30; Morogiello BWC at 3:45:35-37).

At this stage, Plaintiff's and Defendants' characterizations of the facts diverge.  The Court presents each side's version of the story to the extent it comports with the available video footage and other evidence.[4]  According to

---

[4]     Where, as here, the record includes video that the parties concede is authentic and accurate, the Court considers factual allegations only "to the extent that they are not contradicted by video evidence."  *Kass* v. *City of New York*, 864 F.3d 200, 206 (2d Cir. 2017); *see also Marcavage* v. *City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (rejecting plaintiffs' characterization of their behavior toward arresting officers as "cordial" and "compliant" because "audio recording show[ed] indisputably that they were neither courteous nor compliant").

Defendants, Ms. Rosario resisted Officer John and began yelling, pushing him, and flailing her arms in an effort to reach Alexa.  (Def. 56.1 Reply ¶ 31). During this encounter, Ms. Rosario struck John in the face, at which time John and a second officer (whom the Court understands to be Daniel Morogiello) immediately took action to place Ms. Rosario under arrest, including seizing her and moving her to a location on the street, approximately 15 feet away from where the encounter with the two women had taken place. (*Id.* at ¶¶ 32-33).  Plaintiff attempted to follow the two officers but was pushed back by Sergeant Cherry, who acted to prevent Plaintiff from interfering with his wife's arrest.  (*Id.* at ¶ 34).  Despite being pushed back by law enforcement, Plaintiff walked to where his wife was being handcuffed 15 feet away; according to Defendants, Plaintiff placed his hand on John's back and told him, "You don't shove a [expletive] woman like that."  (*Id.* at ¶¶ 35-36).

Plaintiff recalls the facts differently:  At the outset, Plaintiff notes that Officer John did *not* testify that Ms. Rosario resisted or intentionally struck him.  (Pl. 56.1 Reply ¶ 31).  Instead, Plaintiff avers that Ms. Rosario became hostile because the officers were pushing her and allowing the two women to shout at her, and she began to speak with flailing arms.  (*Id.*).  Ms. Rosario swung at one of the two women and inadvertently hit John in the face, at which time officers "got physical" with Ms. Rosario and began to shove her before slamming her against a car door approximately 15 feet away.  (*Id.* at ¶¶ 32-33).  Plaintiff admits following behind as the officers pushed his wife.

(*Id.* at ¶ 34).[5]  Plaintiff also admits walking to where his wife was being handcuffed and telling Officer John, "You don't shove a [expletive] woman like that" as he heard his wife cry out in pain, though he denies touching John. (*Id.* at ¶¶ 35-36).

Defendants are adamant that video footage of the incident depicts Plaintiff's hand on Officer John's shoulder.  (Def. 56.1 Reply ¶ 36; Def. Br. 7-8; Def. Reply 4).  However, while the video footage does show Plaintiff raising his arms (and thus his hands) as he approached John, it is not clear to the Court that Plaintiff ever made physical contact with John.  (*See* Bringle BWC at 3:45:44; LAVO Video).  Defendants also aver, based on Officer John's deposition testimony, that Plaintiff used a "threatening tone" (Def. Br. 8) and "yell[ed] at" John (Def. Reply 4) when telling him, "You don't touch a [expletive] woman like that."  (*See also* John Dep. 85:2 (describing Plaintiff as "screaming at" Officer John)).  In fact, the video demonstrates that although Plaintiff was obviously inebriated, he did not raise his voice.  At this stage of the litigation, the Court accepts Plaintiff's assertion that he did not touch Officer John.  *See Batista* v. *City of New York*, No. 17 Civ. 1994 (KPF), 2020 WL 1659785, at *8 (S.D.N.Y. Apr. 3, 2020).

---

[5]  Plaintiff denies that Sergeant Cherry pushed him away as he followed behind his wife (Pl. 56.1 Reply ¶ 34), but Plaintiff's denial is contradicted by (i) his own testimony (Pl. Dep. 105:15-18 ("As I was following them over there an officer shoved me out of the way, and then continued with them and I continued to follow behind.")); (ii) footage from the LAVO security camera, which clearly depicts Sergeant Cherry pushing Plaintiff away from where officers were arresting Ms. Rosario (LAVO Video 00:07); and (iii) Sergeant Cherry's testimony (Cherry Dep. 65:11-20 (recalling that as Plaintiff walked toward Ms. Rosario, Cherry "pushed [Plaintiff] back" because he "didn't want [Plaintiff] getting close to Officer John and others effecting the arrest of his wife")).

Officer John testified that he was unaware that Plaintiff was behind him until the moment Plaintiff told him, "You don't shove a [expletive] woman like that" (John Dep. 68:11-69:16), and nothing in the video footage contradicts that testimony.  John reacted to Plaintiff's denunciation by turning away from Ms. Rosario and toward Plaintiff and yelling, "What are you [expletive] stupid?" (Def. 56.1 Reply ¶¶ 37-38).  While John remained with Ms. Rosario, three officers — Sergeant Cherry, Officer Zapata, and non-party Officer Victoria Acevedo — walked Plaintiff backwards until reaching the building wall adjacent to LAVO, where they turned Plaintiff around, pushed him back against the wall, and handcuffed him.  (*Id.* at ¶ 39).  Plaintiff describes this moment as being "pushed so hard that it felt like he was lifted off the ground until they slammed him into the wall … in a very strong handed fashion before he was spun around and slammed into the wall headfirst."  (Pl. 56.1 Reply ¶ 39). Plaintiff further testified that it felt like he was getting punched and hit, but that he was not sure if he was actually being hit or if it just felt that way because the officers were being "strong handed."  (*Id.* at ¶ 40).  The video evidence does not show the officers striking Plaintiff.  (*See* Def. 56.1 Reply ¶ 40).

After being handcuffed, Plaintiff was transported to the Midtown North Precinct (the "Precinct"), where he was formally charged with Obstructing Governmental Administration ("OGA") in the Second Degree, in violation of N.Y.

Penal Law § 195.05.  (Def. 56.1 Reply ¶ 41; Crim. Compl.).[6]  At the Precinct, Plaintiff was asked if he was sick or in need of any medical attention, to which he replied, "No, I'm fine."  (Def. 56.1 Reply ¶ 42).  Plaintiff felt some pain, and later observed bruising on his forehead, apparently from being pushed to the wall during his arrest, but he did not seek medical treatment because he did not think any injury was serious.  (*Id.* at ¶¶ 53-54).

While being processed, Plaintiff falsely claimed to the officers that he had been punched by an NYPD officer inside LAVO as he was ascending the steps to leave the club.  (Def. 56.1 Reply ¶¶ 43, 44).  After being placed in a cell at the Precinct, Plaintiff told Officer John that he was going to sue him and urged John to perform a Google search of Plaintiff's name beside the word "lawsuit" to see what results appeared.  (*Id.* at ¶ 45).  Plaintiff and John subsequently "chit-chatt[ed] and jok[ed]" together, and John gave Plaintiff a cell phone so that he could make calls.  (*Id.* at ¶¶ 46-47).[7]

---

[6]     There are handwritten edits to the section of the criminal complaint that lists the charge against Plaintiff.  (*See* Crim. Compl.).  The edits read: "Added PL 240.20(1)" and "Added PL 110/120.00(1)).  The Court understands these edits to be an attempt to add two charges in addition to OGA: disorderly conduct, in violation of N.Y. Penal Law § 240.20(1); and assault in the third degree, in violation of N.Y. Penal Law § 120.00(1), or, alternatively, attempt to commit a crime in violation of N.Y. Penal Law § 110.  It is unclear to the Court whether these additional charges were ever formally added to the criminal complaint.  (*See* John Dep. 90:21-91:16 (testimony of Officer John that the District Attorney told him there was insufficient information to support a charge of disorderly conduct)).  The parties' briefing and Rule 56.1 statements speak only of the OGA charge (*see* Def. 56.1 ¶¶ 41, 49-53; Pl. 56.1 ¶¶ 1, 3), and the Court accordingly focuses on that charge alone.

[7]     Defendants claim that John gave his own cell phone to Plaintiff to use.  (Def. 56.1 ¶ 47).  Plaintiff claims he was allowed to use his own cell phone and was not provided John's personal cell phone.  (Pl. 56.1 Reply ¶ 47).

On June 3, 2019, a criminal complaint for OGA, sworn to by Officer John, was issued, which stated the factual basis for the charge as follows: "While attempting to place [Ms. Rosario] under arrest, I observed the defendant shove me multiple times, while stating in substance: 'YOU DON'T SHOVE A WOMAN!'" (Crim. Compl.).[8]  Plaintiff was arraigned on the OGA charge later that morning and was thereafter released on his own recognizance without conditions.  (Def. 56.1 Reply ¶ 50).  In the days following his arrest, Plaintiff remained in New York for the duration of his planned visit, attended all of his planned meetings, and went out to dinners and to nightclubs "and the usual kind of Wall Street stuff." (*Id.* at ¶ 51 (quoting Pl. Dep. 129:2-7)).  Plaintiff appeared in court once in connection with the OGA charge on July 22, 2019, and the charges against him were later dismissed on September 11, 2019, at a court proceeding at which his presence was waived.  (*Id.* at ¶¶ 52-53).  Ultimately, Plaintiff did not seek any medical treatment in connection with his arrest and prosecution.  (*Id.* at ¶ 55).

---

[8]      In his deposition testimony, Officer John testified, "[Plaintiff] was right next to my face and he was telling me that you don't [expletive] do that to a female or a woman or something like that.... [Plaintiff] was right next to my shoulder at that time."  (John Dep. 69:2-9).  When asked by the questioner, "Did he ever physically touch you?"  John responded, "I thought I got pushed multiple times.  I thought that was him right next to me making that statement.  I thought that was him grab me on my shoulder.  I felt like somebody keep pushing me while I'm trying to put the cuff on her."  (*Id.* at 71:1-7).  John testified that he did not realize that any pushing he had experienced had come from someone other than Plaintiff until he was shown a video of the incident prior to his deposition in this case.  (*Id.* at 71:16-72:18).

## B.     Procedural Background

Plaintiff commenced this action with the filing of a complaint on April 29, 2020, against the City, the NYPD, Officer John, and ten unnamed officers identified as "John Does 1-10." (Dkt. #1).  The City and John filed an answer on September 10, 2020.  (Dkt. #15).  A mediation conference was held on November 25, 2020, but was unsuccessful in resolving any issue in the case. (Dkt. #17).

In light of the unsuccessful mediation, on January 8, 2021, the Court scheduled a telephonic initial pretrial conference to take place on January 22, 2021.  (Dkt. #18).  During the initial pretrial conference, Plaintiff consented to the dismissal of Defendant NYPD, and the City agreed to identify the unidentified police officer defendants.  (*See* Minute Entry for January 22, 2021).[9]  The Court subsequently entered the parties' proposed civil case management plan and scheduling order.  (Dkt. #21).

On March 18, 2021, Plaintiff filed an amended complaint against the City, the NYPD, Sergeant Cherry, Officer John, Officer Zapata, Officer Mavis

---

[9]     Although Plaintiff consented to the dismissal of Defendant NYPD during the initial pretrial conference in this matter (*see* Minute Entry for January 22, 2021), paragraph 66 of the SAC, the operative pleading in this matter, continues to refer to the NYPD as a Defendant.  (SAC ¶ 66).  However, "the NYPD is not a proper defendant under Section 396 of the New York City Charter."  *Figueroa* v. *City of New York*, No. 20 Civ. 10050 (LAP), 2022 WL 799551, at *1 (S.D.N.Y. Mar. 16, 2022); New York City Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *see also Lauro* v. *Charles*, 219 F.3d 202, 205 n.2 (2d Cir. 2000) (affirming dismissal of Section 1983 claim against NYPD because NYPD was not a "suable entity" under Section 396).  Accordingly, to the extent Plaintiff continues to purport to bring claims against the NYPD, such claims are dismissed.

Garcia, and "John Does 1-10."  (Dkt. #22).  On April 27, 2021, defense counsel requested an extension of time for Defendants Zapata and Garcia to respond to the amended complaint (Dkt. #33), which the Court granted (Dkt. #34).  On April 30, 2021, Plaintiff filed a letter informing the Court that Defendants had inadvertently misidentified one of the officers named as a Defendant in the first amended complaint and asked the Court for leave to file a second amended complaint to name the correct defendant.  (Dkt. #35).  The Court granted Plaintiff leave to file a second amended complaint.  (Dkt. #36).

Plaintiff filed the Second Amended Complaint (the "SAC" (Dkt. #39)) on May 9, 2021, naming as Defendants the City, Cherry, John, Zapata, Garcia, Officer Victoria Acevedo, and "John Does 1-10."  The SAC alleges nine counts: (i) excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution;[10] (ii) illegal search and seizure in violation of the Fourth Amendment; (iii) malicious prosecution in violation of the Fourteenth Amendment;[11] (iv) false arrest and false imprisonment; (v) assault and battery;

---

[10]   The SAC alleges that Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights.  (*See* SAC ¶¶ 30, 46).  However, excessive force claims in the course of an arrest are rooted in the Fourth Amendment, not the Fourteenth Amendment.  *See Albright* v. *Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." (internal quotation marks and citation omitted)).  Plaintiff concedes this point in his opposition brief and directs the Court to consider his claims as arising under the Fourth Amendment.  (Pl. Opp. 18 n.2).

[11]   *See generally Thompson* v. *Clark*, 142 S. Ct. 1332, 1335 (2022) (noting that malicious prosecution claim under Section 1983 arises under the Fourth Amendment).

(vi) failure to intervene; (vii) municipal liability; (viii) *respondeat superior*; and (ix) negligence.[12]

On June 8, 2021, defense counsel sought an extension of time for Defendant Acevedo to respond to the SAC (Dkt. #44), which the Court granted the following day (Dkt. #45).  Acevedo filed her answer on June 15, 2021.  (Dkt. #46).  On September 23, 2021, the Court held a status conference at which it set a briefing schedule for Defendants' motion for summary judgment.  (*See* Minute Entry for September 23, 2021).  On December 2, 2021, the parties filed a stipulation voluntarily dismissing Plaintiff's federal claims against the City based on *Monell* v. *Dep't of Soc. Svcs.*, 436 U.S. 658 (1978), and all of Plaintiff's claims against Defendant Acevedo.  (Dkt. #53).[13]

---

[12]   While Plaintiff makes no explicit reference to state law in the SAC, it is evident that his fifth through ninth claims are brought under the common law as developed in the state of New York.  Plaintiff clarifies in his opposition brief that he intends to assert most or all of his Section 1983 claims under their state-law analogues as well.  (*See* Def. Br. 1 (characterizing the SAC as asserting federal claims for false arrest, malicious prosecution, excessive force, and failure to intervene, as well as state law claims for assault and battery, negligence, and *respondeat superior*); Pl. Opp. 27 (criticizing Defendants' brief as failing to contest "any of Plaintiff's other state law claims")).  Conversely, the Court understands that Defendants intend to challenge all of Plaintiff's claims, whether based on federal or state law.  (*See, e.g.*, Def. Reply 8 (asking the Court to grant summary judgment on "all plaintiff's false arrest claims whether based on federal or state law" and to dismiss this matter in its entirety)).

[13]   Due to an apparent clerical error on the docket, the City was terminated as a Defendant in this matter.  However, Plaintiff's state law claims against the City for negligence and *respondeat superior* remain alive and are addressed in this motion.

Perhaps more importantly, Plaintiff advised the Court in his opposition submission that "[t]he parties recently learned that the stipulation that was filed with the Court improperly named Officer Acevedo when it should have named Officer Garcia."  (Pl. Opp. 2 n.1; *see also* Dkt. #53).  While Plaintiff suggests that the parties would meet and confer to resolve the issue, no amended stipulation was filed, and the case remains dismissed as to Defendant Acevedo.  Furthermore, because the parties do not claim that Defendant Garcia had any personal involvement in the events underlying Plaintiff's civil rights claims, those claims are dismissed with prejudice as to her.

On December 7, 2021, Defendants sought an extension of time to file their summary judgment motion, which the Court granted the same day. (Dkt. #56, 57). Defendants filed their motion for summary judgment and supporting documents on December 20, 2021. (Dkt. #58-61). On January 18, 2022, Plaintiff sought an extension of time to file his opposition, which the Court granted the same day. (Dkt. #62, 63). Plaintiff filed his opposition brief and supporting documents on February 5, 2022. (Dkt. #66, 67). On February 22, 2022, Defendants sought an extension of time to file their reply brief, which the Court granted the same day. (Dkt. #68, 69). Defendants filed their reply brief and supporting documents on February 28, 2022. (Dkt. #70-72). Accordingly, Defendants' motion is fully briefed and ripe for the Court's consideration.

## DISCUSSION

Plaintiff asserts federal and state law claims arising out of his arrest and prosecution, including claims against the Officers for (i) excessive force/assault and battery, (ii) illegal search and seizure, (iii) malicious prosecution, (iv) false arrest and false imprisonment, and (v) failure to intervene; a claim against all Defendants for negligence; and a claim against the City for *respondeat superior*. To preview, the Court will first address the applicable legal standards for motions for summary judgment under Federal Rule of Civil Procedure 56. It will then discuss Plaintiff's federal and state civil rights claims against the Officers, before turning to Plaintiff's remaining state law claims.

### A.      Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986).[14]  A genuine dispute exists where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Fireman's*

*Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir.

2016) (internal quotation marks and citation omitted).  A fact is "material" if it

"might affect the outcome of the suit under the governing law[.]"  *Anderson* v.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party "bears the initial burden of demonstrating 'the

absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers*

*Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477

U.S. at 323), the party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see*

*also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-

---

[14]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary
judgment standard from a genuine "issue" of material fact to a genuine "dispute" of
material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting
that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue'
becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment
determination.").  This Court uses the post-amendment standard, but continues to be
guided by pre-amendment Supreme Court and Second Circuit precedent that refer to
"genuine issues of material fact."

moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

**B.**    **The Court Grants Summary Judgment to Defendants as to Plaintiff's Civil Rights Claims**

Plaintiff brings claims of excessive force, illegal search and seizure, malicious prosecution, false arrest and false imprisonment, and failure to intervene, all under 42 U.S.C. § 1983.  The Court begins by outlining the general principles for establishing a federal civil rights claim under Section 1983, along with the doctrine of qualified immunity, before analyzing each of Plaintiff's claims.

**1.    Civil Rights Actions Under 42 U.S.C. § 1983 and Qualified Immunity**

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under Section 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis* v. *Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).  Furthermore, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Victory* v. *Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *accord Patterson* v. *County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *see generally Tangreti* v. *Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020).

A valid qualified immunity defense can foreclose liability under Section 1983.  "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted).  A right is clearly established if "existing law ... placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011)).  "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry ... is whether it would be clear to a *reasonable* officer that his conduct was unlawful *in the situation he confronted.*'"  *Barboza* v. *D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)) (emphases in *Barboza*).

Qualified immunity protects officers when "their decision was reasonable, even if mistaken"; indeed, it "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Johnson* v. *Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991)); *cf. Sabir* v. *Williams*, 37 F.4th 810, 822 (2d Cir. 2022) ("Although the scope of qualified immunity is considered broad enough to protect 'all but the plainly incompetent or those who knowingly violate the law,' it is not available when an officer's actions are not objectively reasonable in light of clearly established law." (quoting *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1867 (2017))).

### 2. The Court Grants Summary Judgment as to Plaintiff's False Arrest and False Imprisonment Claims

Beginning with the earliest in time of Plaintiff's claims, Plaintiff alleges that he was detained, arrested, and imprisoned despite a lack of probable cause or other satisfactory legal justification. (*See, e.g.*, Pl. 56.1 ¶¶ 1-6). For the reasons discussed below, the Court finds that Officers had probable cause to arrest Plaintiff and grants summary judgment to Defendants.

### a. Applicable Law

A federal false arrest claim raised under Section 1983 is "substantially the same as a claim for false arrest under New York law." *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The elements of false arrest under New York law are: "[i] the defendant intended to confine [plaintiff], [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement[,] and [iv] the confinement was not otherwise privileged." *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and citation omitted).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Weyant*, 101 F.3d at 852 (internal quotation marks omitted); *accord Figueroa* v. *Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest ... will defeat a claim of false arrest under the Fourth Amendment."); *Jaegly* v. *Couch*, 439 F.3d 149, 152 (2d Cir. 2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."). Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information

as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson*, 702 F.3d at 19 (internal quotation marks and alterations omitted). As the Second Circuit recently observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, *Jenkins* v. *City of New York*, 478 F.3d 76, 90 (2d Cir. 2007), based on "a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury* v. *Wertman*, 721 F.3d 84, 93 (2d Cir. 2013). The court considers "those facts available to the officer at the time of the arrest and immediately before it." *Fabrikant* v. *French*, 691 F.3d 193, 214 (2d Cir. 2012) (quoting *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). "The significance of each of these factors may be enhanced or diminished by surrounding circumstances." *Jenkins*, 478 F.3d at 90.

*Guan* v. *City of New York*, 37 F.4th 797, 804 (2d Cir. 2022).

By contrast, in the qualified immunity context, an officer invoking the probable cause defense need only establish that he or she acted with "arguable probable cause" — that is, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law." *Cerrone* v. *Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001); *see also Kass* v. *City of New York*, 864 F.3d 200, 205-07 (2d Cir. 2017) (concluding that defendant officers were entitled to qualified immunity because there was arguable probable cause for arrest, without reaching the question of whether there was actual probable cause).

Arguable probable cause is an objective standard that "exists if either [i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)). "[W]hether an officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore* v. *Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa*, 825 F.3d at 100 (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)). "Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citation omitted).

"Thus, under both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins*, 478 F.3d at 88. By contrast, if, "on the undisputed facts the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depended on material issues of

fact, then summary judgment is inappropriate for both New York and federal false arrest claims." *Id.*

### b.   Analysis

A person is guilty of Obstruction of Governmental Authority in the Second Degree when he "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act[.]" N.Y. Penal Law § 195.05. "An individual ... may be convicted under this statute when [i] a public servant is performing an official function; [ii] the individual prevents or attempts to prevent the performance of that function by interfering with it; and [iii] the individual does so intentionally." *Kass*, 864 F.3d at 207.

With respect to the first element, "an officer is deemed to be 'performing an official function' if that function is authorized by law." *Gersbacher* v. *City of New York*, No. 14 Civ. 7600 (GHW), 2017 WL 4402538, at *7 (S.D.N.Y. Oct. 2, 2017) (quoting *Kass*, 864 F.3d at 207). As to the second element, "the interference must at least in part be 'physical' and cannot consist solely of verbal statements." *Kass*, 864 F.3d at 209 (quoting *People* v. *Case*, 42 N.Y.2d 98, 101-02 (1977)); *see also Lee* v. *McCue*, No. 04 Civ. 6077 (CM), 2007 WL 2230100, at *5 (S.D.N.Y. July 25, 2007) ("[W]ords alone, even abusive ones, cannot give rise to probable cause to arrest for obstructing governmental administration as a matter of law.").

This does not mean that there must be "'physical force involved,'" however. *Kass*, 864 F.3d at 210 (quoting *People* v. *Romeo*, 779 N.Y.S.2d 860, 862 (3d Dep't 2004)). Physical interference also includes "'inappropriate and disruptive conduct at the scene of the performance of an official function.'" *Id.* at 209-10 (quoting *Romeo*, 779 N.Y.S.2d at 861). Accordingly, the second element "is satisfied when an individual 'intrude[s] himself into, or get[s] in the way of, an ongoing police activity.'" *Id.* at 210 (quoting *In re Kendell R.*, 897 N.Y.S.2d 83, 84 (1st Dep't 2010)); *see also Hilderbrandt* v. *City of New York*, No. 13 Civ. 1955 (ARR) (VVP), 2014 WL 4536736, at *4 (E.D.N.Y. Sept. 11, 2014) ("The physical requirement ... can be met [ ] by the physical encroachment on police officers' work or by the performance of threatening and distracting movements near officers."); *see generally Donohue* v. *Marsh*, No. 19 Civ. 207 (RPK), 2022 WL 4111025, at *4 (E.D.N.Y. Sept. 8, 2022) ("Under New York law, the prohibition against interference is construed broadly." (collecting cases)).

A finding of interference "may [ ] be predicated on a defendant's refusal to obey orders to leave a premises, ... to step back from an accident scene or to keep away from an area where a disturbance is taking place." *Fana* v. *City of New York*, No. 15 Civ. 8114 (PGG), 2018 WL 1581680, at *8 (S.D.N.Y. Mar. 27, 2018) (internal citation omitted). That said, "[f]ailing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration." *Id.* (quoting *Dowling* v. *City of New York*, No. 11 Civ. 4954 (NGG) (RML), 2013 WL 5502867,

at *4 (E.D.N.Y. Sept. 30, 2013)).  The failure to obey the order must create

"some other hazard or interference" to rise to the level of obstruction necessary

for a charge of obstructing government administration.  *Id.*

For example, this element may be met where "prudent officers could

believe that [an individual] was attempting to interfere with the officers' efforts

to contain what had only recently been a volatile situation," such as an

altercation.  *Berger* v. *Schmitt*, 91 F. App'x 189, 191 (2d Cir. 2004) (summary

order) (finding probable cause to arrest plaintiff for obstructing governmental

administration where plaintiff "intervened in a verbal altercation between [an

officer] and a supermarket patron," an officer told him to leave, and plaintiff

"started to depart," but "doubled back in order to ask the various participants

to the altercation for their names and contact information"); *Decker* v. *Campus*,

981 F. Supp. 851, 858 (S.D.N.Y. 1997) (finding probable cause to arrest

plaintiff for obstructing governmental administration where plaintiff, *inter alia*,

"failed to comply with a deputy sheriff's instructions to 'step back' from the

scene of an accident," and "approached a rescue worker, touched his arm, and

asked him questions, while the worker was trying to save [the accident victim's]

life"); *Romeo*, 779 N.Y.S.2d at 861 ("[E]vidence that defendant was belligerent,

uncooperative and refused several direct requests that he keep away from the

officers as they attempted to subdue his girlfriend was sufficient to establish

the crime of obstructing governmental administration in the second degree.").

"To satisfy the third element, 'an individual must intend to prevent the

public servant from performing the official function.'" *Gersbacher*, 2017 WL

24

4402538, at *7 (quoting *Murray* v. *City of New York*, No. 15 Civ. 6768 (LGS),
2017 WL 3309728, at *4 (S.D.N.Y. Aug. 2, 2017)).  In assessing this element,
courts must "afford[ ] [officers] great latitude in ascertaining intent," because
officers face "great 'practical restraints … in the field.'"  *Id.* (quoting *Kass*, 864
F.3d at 210).

Defendants argue that summary judgment should be granted as to
Plaintiff's false arrest claims because the arrest was supported by probable
cause, or, in the alternative, because the Officers are entitled to qualified
immunity.  (Def. Br. 7).[15]  The Court agrees that Plaintiff's arrest was
supported by probable cause, and thus necessarily satisfies the lower standard
of arguable probable cause.  *First*, there is no dispute that the Officers were
performing an official function when Plaintiff approached the arrest scene.
*Second*, the video evidence clearly demonstrates interference, in that Plaintiff
was pushed away from the officers arresting his wife, but then continued to
approach those officers.  (*See* LAVO Video).

*Third*, with respect to the intent element of an OGA charge, the Officers
needed to have probable cause to believe that Plaintiff was not merely voicing

---

[15]    Defendants further argue that probable cause existed for Plaintiff's arrest because
Plaintiff approached Officer John from the rear, placed his hand on John's back, and
told him, "You don't shove a [expletive] woman like that!"  (Def. Br. 7-8).  Choosing his
words carefully, Plaintiff rejoins that he "never intentionally made physical contact with
any officer." (Pl. Opp. 9-10).  As discussed *supra*, the video evidence is inconclusive as
to whether Plaintiff actually touched Officer John, although it does show him
approaching the officer and raising his arms.  This factual dispute is ultimately
irrelevant:  The Court finds that probable cause existed because Plaintiff continued to
approach the officers who were arresting Ms. Rosario despite being pushed away from
them by Sergeant Cherry.

his concerns about their conduct, but that he intended to interfere in their arrest of Ms. Rosario. *See Dowling*, 2013 WL 5502867, at *4 ("In this case, Officer Gasquez would have had to have probable cause to believe that [p]laintiff was not merely trying to question officers about why they were searching his brother, or expressing his annoyance, but that his intent was to interfere in the search, and ultimately the arrest, of [his brother]."). To review, the video evidence demonstrates that the circumstances leading up to Ms. Rosario's arrest, as well as the arrest itself, were volatile. The video shows that Plaintiff followed after the Officers as they moved Ms. Rosario across the street from a bustling nightclub, was pushed away by Sergeant Cherry, and yet still continued to approach; ultimately, Plaintiff stood shoulder-to-shoulder with Officer John — who was in the process of handcuffing Ms. Rosario — while stating, "You don't shove a [expletive] woman like that." (*See* LAVO Video; Morogiello BWC 3:46:49). Additionally, the Officers' testimony is consistent that in the commotion that accompanied Ms. Rosario's arrest, they were pushed forward and immediately thereafter turned to see Plaintiff standing directly behind them. (*See* Cherry Dep. 39:21-43:21 ("All I know I felt force from the rear ... and looked over my right shoulder to see what was behind me [and saw Plaintiff]. ... I was pretty convinced at that point that he, in fact, committed the offense by applying physical force to me ... and prevented me from assisting in the handcuffing of [Ms. Rosario]."); John Dep. 71:1-72:14 ("I thought I got pushed multiple times. ... I thought that was him grab me on the shoulder. I felt like somebody keep pushing me while I'm trying to put the cuff

26

on her.")).  Officer John continued to believe that Plaintiff had pushed him until two days prior to his deposition, when he reviewed video footage of the incident. (John Dep. 72:11-18).  The Officers believed Plaintiff was pushing them as he spoke, leading them reasonably to believe his intent was to interfere in Ms. Rosario's arrest.  *See Gersbacher*, 2017 WL 4402538, at *7 ("Because of the great 'practical restraints on police in the field,' officers are afforded great latitude in ascertaining intent." (quoting *Kass*, 864 F.3d at 210)).  The Court finds that no reasonable jury could find, under these chaotic circumstances, that it was objectively unreasonable for the Officers to believe that there was probable cause to arrest Plaintiff for OGA.

With respect to Plaintiff's false arrest claim under state law, "[p]robable cause to arrest 'constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Theodat* v. *City of New York*, No. 16 Civ. 3977 (FB) (SJB), 2018 WL 3825886, at *2 (E.D.N.Y. Aug. 10, 2018) (quoting *Weyant*, 101 F.3d at 852) (internal citation and quotations omitted).  Defendants are therefore entitled to summary judgment as to Plaintiff's state law false arrest claim as well.

### 3. The Court Grants Summary Judgment as to Plaintiff's Search and Seizure Claim

In the SAC, Plaintiff alleges that Defendants illegally and improperly searched and seized his person "without any warrant or justification, wholly lacking in any cause whatsoever, probable or otherwise," in violation of the Fourth Amendment's proscription of unreasonable searches and seizures.

(SAC ¶¶ 37, 39).[16]  Plaintiff alleges that as a result, he was "humiliated, disgraced, [and] suffered damage to his reputation, physical injuries, mental anguish and injury and monetary loss[.]"  (*Id.* at ¶ 41).  However, in the parties' competing Rule 56.1 statements, there is no mention of Plaintiff being searched.  (*See generally* Def. 56.1 Reply (containing positions of both sides)).[17] Defendants counter that they are entitled to summary judgment on this claim because (i) Plaintiff offers no factual allegations as to the scope of the alleged search, the manner in which it was performed, or the location of its occurrence; and (ii) a search incident to a lawful arrest is constitutional.  (Def. Br. 12).  The Court finds that Defendants are entitled to summary judgment as to Plaintiff's illegal search and seizure claim.

### a.    Applicable Law

The Fourth Amendment to the Constitution of the United States provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

---

[16]    Plaintiff does not purport to bring his search and seizure claim under the New York State constitution, and for good reason:  Courts in this District have found that a plaintiff cannot maintain simultaneous state and federal civil rights claims "where Section 1983 provides an adequate remedy under the U.S. Constitution's parallel provisions."  *De'Bey* v. *City of New York*, No. 20 Civ. 1034 (PGG) (SLC), 2021 WL 8013765, at *17 (S.D.N.Y. Oct. 26, 2021) (collecting cases), *report and recommendation adopted*, No. 20 Civ. 1034 (PGG) (SLC), 2022 WL 909790 (S.D.N.Y. Mar. 29, 2022); *see also Camac* v. *Long Beach City Sch. Dist.*, No. 09 Civ. 5309 (DRH) (ARL), 2011 WL 3030345, at *19 (E.D.N.Y. July 22, 2011) ("Where, as here, plaintiffs have asserted a viable Fourth Amendment claim under Section 1983[,] any violation of the plaintiff['s] right to be free of unreasonable searches and seizures can be vindicated through this claim." (quotation and citation omitted)).

[17]    Plaintiff points the Court in his opposition brief to the video of his arrest, which shows him being searched.  (Pl. Opp. 17-18).  The fact remains that, again in contravention of Local Rule 56.1, Plaintiff does not identify the search as a "material fact[] as to which it is contended that there exists a genuine issue to be tried."  Local Rule 56.1(b).

seizures, shall not be violated[.]"  U.S. Const. amend. IV.  "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley* v. *California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006)). "It is well established that a warrantless search is '*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'"  *United States* v. *Diaz*, 122 F. Supp. 3d 165, 170 (S.D.N.Y. 2015) (quoting *Katz* v. *United States*, 389 U.S. 347, 357 (1967)).

One such exception is the "search incident to arrest" doctrine.  *Sullivan* v. *City of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *9 (S.D.N.Y. July 10, 2018).  Under that doctrine, police officers may search a person in connection with a lawful arrest.  *Id.*  Put differently, "where police officers have probable cause to effect a[n] arrest, they may search the suspect without a warrant incident to that arrest."  *United States* v. *Herron*, 18 F. Supp. 3d 214, 223 (E.D.N.Y. 2014) (citing *United States* v. *Robinson*, 414 U.S. 218 (1973)). The doctrine both "protect[s] arresting officers and safeguard[s] any evidence of the offense of arrest that an arrestee might conceal or destroy."  *Arizona* v. *Gant*, 556 U.S. 332, 339 (2009).

### b.    Analysis

As Defendants observe (Def. Br. 12), the SAC contains no factual allegations regarding the scope of the alleged search, or the manner or location in which the alleged search was performed.  Plaintiff only conclusorily alleges that Defendants "illegally and improperly searched and seized [Plaintiff's]

person" (SAC ¶ 37), "in violation of the Fourth Amendment's proscription of unreasonable searches and seizures" (*id.* at ¶ 39), and that the search was "undertaken and conducted in a willful and malicious manner, with an immoral purpose to injure the person, reputation, standing and integrity of Plaintiff" (*id.* at ¶ 40). But as just explained, the Court finds as a matter of law that the Officers had probable cause to arrest Plaintiff, thereby rendering the search identified in Plaintiff's opposition papers appropriate pursuant to the search incident to arrest exception of the Fourth Amendment. Having failed to identify a triable issue of fact, Plaintiff's search and seizure claim cannot withstand summary judgment.

### 4. The Court Grants Summary Judgment as to Plaintiff's Excessive Force and Assault and Battery Claims

Nominally, Plaintiff brings two claims concerning the Officers' use of force: (i) excessive force in violation of the Fourth Amendment (SAC ¶¶ 29-35), and (ii) assault and battery under New York common law (*id.* at ¶¶ 53-58). Functionally, though, both claims are governed by common facts and are largely subject to common analysis. "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." *Humphrey* v. *Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (summary order). Therefore, the Court analyzes these claims together. As discussed below, the Court finds that Defendants are entitled to summary judgment as to these claims as well.

### a.     Applicable Law

"Claims that law enforcement officers have used excessive force ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham* v. *Connor*, 490 U.S. 386, 395 (1989).  A use of force violates the Fourth Amendment if the police officer's conduct is "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Cruz* v. *City of New York*, 232 F. Supp. 3d 438, 451 (S.D.N.Y. 2017) (quoting *Maxwell* v. *City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (internal quotation omitted)); *accord Mickle* v. *Morin*, 297 F.3d 114, 120 (2d Cir. 2002).  "[A] *de minimis* use of force will rarely suffice to state a Constitutional claim." *Romano* v. *Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

When analyzing excessive force claims, courts are instructed to look at the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must make "allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  The analysis involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Figueroa*, 825 F.3d at 105 (quoting *Graham*, 490 U.S. at 396 (internal quotation marks omitted)).  To aid in this inquiry, courts are directed to consider "at least three factors," known

as the *Graham* factors: "[i] the nature and severity of the crime leading to the arrest, [ii] whether the suspect pose[d] an immediate threat to the safety of the officer or others, and [iii] whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *See Tracy* v. *Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396).

For an officer to be "grant[ed] summary judgment against a plaintiff on an excessive force claim ... no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (citing *O'Bert* v. *Vargo*, 331 F.3d 29, 37 (2d Cir. 2003)).  Put somewhat differently, the evidence must demonstrate that "no rational jury could have found that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon* v. *Miller*, 66 F.3d 416, 426 (2d Cir. 1995).  Even with that standard, courts routinely grant summary judgment in favor of law enforcement officers on claims of excessive force.  *See, e.g.*, *MacLeod* v. *Town of Brattleboro*, 548 F. App'x 6 (2d Cir. 2013) (summary order); *Kalfus* v. *N.Y. & Presbyterian Hosp.*, 706 F. Supp. 2d 458 (S.D.N.Y. 2010), *aff'd*, 476 F. App'x 877 (2d Cir. 2012) (summary order); *see also Berman* v. *Williams*, No. 17 Civ. 2757 (JGK), 2019 WL 4450810, at *7 (S.D.N.Y. Sept. 17, 2019) (granting summary judgment where video evidence "undermines the plaintiff's claim that the defendants used excessive force"); *Lin* v. *City of New York*, No. 14 Civ. 9994 (PAE), 2016 WL 7439362, at *11-12 (S.D.N.Y. Dec. 21, 2016) (granting summary judgment where video evidence

"refutes" plaintiff's allegations of excessive force, and noting that "[t]he video does not reveal any punching, kicking, or striking of [Plaintiff] in any way").

### b.    The Court Grants Summary Judgment in Favor of Officer John

At the outset, summary judgment is warranted for Officer John on this claim.  "A prerequisite for any award [of] damage under 42 U.S.C. § 1983 for an alleged constitutional violation is the personal involvement of the defendant." *Cruz*, 232 F. Supp. 3d at 452 (citation omitted); *see Warheit* v. *City of New York*, 271 F. App'x 123, 126 (2d Cir. 2008) (summary order) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).  It is undisputed that Officer John was in the process of arresting Ms. Rosario when Plaintiff was placed under arrest and that he was not personally involved in the alleged use of excessive force.  (*See, e.g.*, John Dep. 74:5-22).  Thus, the Court grants summary judgment in favor of Officer John on Plaintiff's excessive force claims.

### c.    The Court Grants Summary Judgment in Favor of Sergeant Cherry and Officer Zapata

Plaintiff's claims against Sergeant Cherry and Officer Zapata, two of the three officers who effected Plaintiff's arrest, require further analysis.[18]  Plaintiff contends that after he commented on the way his wife was being treated, "[Sergeant] Cherry, Officer Zapata and Officer Acevedo grabbed him without

---

[18]    As noted, the Court previously endorsed the parties' stipulation dismissing Plaintiff's claims against Officer Acevedo, the third officer involved in Plaintiff's arrest.

any verbal commands or warnings, or knowledge that he was being arrested and ran him into [LAVO's] exterior wall." (Pl. 56.1 ¶ 30). Indeed, Plaintiff "felt like he was lifted off the ground before being slammed into the wall," and also claims to have felt as though he was being "punched" or "slapped." (*Id.* at ¶ 31). Defendants argue that they are entitled to summary judgment on this claim because (i) the force used to arrest Plaintiff was objectively reasonable under the circumstances (Def. Br. 17-19); (ii) Plaintiff's injuries, if any, were *de minimis* (*id.* at 19-22); and (iii) Defendants are alternatively entitled to qualified immunity (*id.* at 22-23). The Court agrees.

As the above cases make clear, context matters. Plaintiff's encounter with the Officers was part and parcel of a rapidly-evolving situation, involving a late hour, a boisterous nightclub crowd, considerable alcohol consumption, competing allegations of criminal conduct (here, theft and assault), and an understandable law enforcement concern about physical violence. Certain facts are clear from the video evidence, including in particular the LAVO video footage. Almost immediately after Plaintiff and his wife exited LAVO, Ms. Rosario became embroiled in a renewed war of words with former club patron Alexa.[19] When Ms. Rosario exacerbated matters by swatting away Alexa's hand, Officer John interposed himself between the two women to deescalate the situation. His efforts were not successful, as the two women continued to talk over him while Plaintiff (who is taller than both officers) stood nearby.

---

[19]    Indeed, Ms. Rosario's conduct gave credence to Alexa's earlier claims to the officers that Ms. Rosario had assaulted her.

Officer John and Officer Morogiello then walked on either side of Ms. Rosario, to increase the distance between the two women. At that time, Plaintiff remained behind Officer John. Shortly thereafter, Ms. Rosario threw down her purse, resisted the officers' efforts to restrain her, and lunged in Alexa's direction. In the process, Ms. Rosario assaulted Officer John, again while Plaintiff stood nearby.

At this point, Officers John and Morogiello moved Ms. Rosario across the street from the nightclub in order to effectuate her arrest. Plaintiff tried to follow them, but was pushed back by Sergeant Cherry precisely so that Plaintiff could not interfere with the arrest process. Undaunted, Plaintiff crossed the street, positioned himself behind Officer John, raised his arms, and began remonstrating with John using intemperate language. At this point, Plaintiff had now countermanded the directives of one law enforcement officer, and was interfering with the performance of duties of several others. While Officer John remained with Plaintiff's wife, Sergeant Cherry, Officer Zapata, and Officer Acevedo walked Plaintiff backwards to the opposing side of the street; they pushed him against the exterior wall next to LAVO, turned him around, and placed him back against the wall to effectuate his arrest. At no point did any officer punch or slap Plaintiff.

As noted, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "'[I]t is ... well established that not every push or shove, even if it may later seem unnecessary

in the peace of a judge's chambers, violates a [plaintiff's] constitutional rights.'"
*Kayo* v. *Mertz*, 531 F. Supp. 3d 774, 797 (S.D.N.Y. 2021) (quotation omitted);
*accord Robison* v. *Via*, 821 F.2d 913, 923 (2d Cir. 1987). "[T]he right to
effectuate an arrest does include 'the right to use some degree of physical
coercion.'" *Kayo*, 531 F. Supp. 3d at 797 (quoting *Esmont* v. *City of New York*,
371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005)). Given the circumstances just
described — including Plaintiff's refusal to comply with Sergeant Cherry's
directive and his insistence on interfering with his wife's arrest, which itself
occurred after she assaulted an officer while severely alcohol-impaired — it was
not unreasonable for the Officers to use a modest amount of force to move
Plaintiff away from the site of his wife's arrest and then place him against the
wall in the course of arresting him. There is no evidence that force was used
for any purpose other than to restrain Plaintiff. The video evidence makes clear
that the three Officers pushed Plaintiff against the wall, turned him around,
held him in place as they placed handcuffs on him, and then began to lead him
away from the scene.

The *de minimis* nature of Plaintiff's injuries further confirm that the force
used was not excessive. As an initial matter, a plaintiff need not have sought
medical attention to support an excessive force claim. *Hodge* v. *Village of
Southampton*, 838 F. Supp. 2d 67, 77 (E.D.N.Y. 2012) ("The fact that plaintiff
did not require substantial medical treatment at the hospital following the
incident does not necessarily mean that [defendant] is entitled to summary
judgment."). "If the force used was unreasonable and excessive, the plaintiff

may recover even if the injuries inflicted were not permanent or severe." *Robison*, 821 F.2d at 924.  Conversely, it is not the case "that complaints of pain, bruising, and swelling are alone sufficient to preclude summary judgment." *Richardson* v. *N.Y.C. Health & Hosps. Corp.*, No. 05 Civ. 6278 (RJS), 2009 WL 804096, at *11 (S.D.N.Y. Mar. 25, 2009).  Instead, "courts must look to the totality of the circumstances relating to the conduct of law enforcement officers," including the "manner in which the plaintiff's alleged injuries were inflicted during the arrest." *Id.*

Somewhat tellingly, Plaintiff's SAC does not allege any specific physical injury.  (*See* SAC ¶ 35 ("Plaintiff was humiliated, disgraced, suffered damage to his reputation, physical and mental anguish and injury and monetary loss and damage all to his great detriment.")).  By the time of his deposition, Plaintiff claimed that he suffered head pain and a cut on his forehead, and that he developed a bruise the following day.  (Pl. Dep. 165:3-165:9; *see also* Dkt. 67-10 at 12-14 (photos of Plaintiff's bruise)).[20]  Plaintiff refused medical assistance because he did not think the injury was "that serious."  (*Id.* at 163:22-165:3).  While Plaintiff's bruising is unfortunate, it is insufficient to support an excessive force claim on these facts.  *See, e.g.*, *Kayo*, 531 F. Supp. 3d at 798 (finding that plaintiff's injuries were "too *de minimis* to ... raise an inference that an unconstitutional amount of force was used in effecting his arrest,"

---

[20]    Plaintiff also testified that he developed "anxiety around police officers" resulting in "a couple of nightmares of the incident."  (Pl. Dep. 166:19-167:1).  Plaintiff did not seek professional help for the anxiety or nightmares "[b]ecause it went away."  (*Id.* at 167:2-6).

where plaintiff testified that he suffered scrapes on his knees and elbows and experienced pain in his ribs and neck, but he neither sought medical treatment nor treated the injuries himself); *see also Bove* v. *New York City*, No. 98 Civ. 8800 (HB), 1999 WL 595620, at *6 (S.D.N.Y. Aug. 6, 1999) (finding that NYPD's use of force was, at most, *de minimis* where plaintiff's only injury was "a slight bruise to his head, for which he was told [by medical personnel] to apply ice and take Motrin"); *cf. Maxwell*, 380 F.3d at 108-10 (reversing district court's grant of summary judgment to defendants on excessive force claim where police officer shoved plaintiff head first into the partition of a patrol car, resulting in pain and post-concussive syndrome).

Even if the Officers had used excessive force in the course of restraining and arresting Plaintiff — which they did not — their actions would be subject to qualified immunity.  In the context of excessive force claims, qualified immunity applies if "a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Usavage* v. *Port Auth. of N.Y & N.J.*, 932 F. Supp. 2d 575, 594 (S.D.N.Y. 2013) (citing *Lennon*, 66 F.3d at 425).  The Second Circuit has observed that, in some excessive force cases, the qualified immunity and Fourth Amendment analyses converge on one question: "Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Cowan ex rel. Est. of Cooper* v. *Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003).  The Court finds that under these circumstances, a reasonable officer would not have understood that the force used in moving Plaintiff away from

his wife and effecting his arrest were unlawful and grants the Officers summary judgment on this alternative basis.

Put simply, no reasonable jury could conclude that Plaintiff suffered a Fourth Amendment violation with respect to the Officers' use of force in the runup to his arrest.  Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiff's federal excessive force claim and his analogous state law assault and battery claim.

### 5.   The Court Grants Summary Judgment as to Plaintiff's Malicious Prosecution Claims

In a variation on his false arrest claim, Plaintiff alleges in Count Three of the SAC that there was no reasonable basis or probable cause for the OGA charge filed against him, as evidenced by the matter's ultimate dismissal.  (SAC ¶¶ 44-45).  Defendants respond that both Plaintiff's arrest and prosecution were supported by adequate probable cause.  For the reasons articulated below, the Court finds that Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claims.

### a.   Applicable Law

To prevail on a Section 1983 claim for malicious prosecution, a plaintiff must demonstrate both (i) a Fourth Amendment violation and (ii) the common-law elements of the tort of malicious prosecution.  *See Mitchell* v. *City of New York*, 841 F.3d 72, 79 (2d Cir. 2016).  Under New York law, the elements of the tort of malicious prosecution include "[i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can succeed, [iii] the proceeding was begun with malice, and [iv] the matter

terminated in plaintiff's favor." *Rentas* v. *Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (internal quotation marks and alterations omitted).  A claim for malicious prosecution under Section 1983 requires the additional element of "[v] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

"As with false arrest claims, the existence of probable cause is a complete defense to a claim of malicious prosecution in New York, but unlike false arrest claims, the defendant must have possessed probable cause as to each offense charged." *Costello* v. *Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (quoting *Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). "[W]hile a false arrest claim fails if there was probable cause to arrest the plaintiff for any offense, in the malicious prosecution context, there must be probable cause for the offenses charged." *Tompkins* v. *City of New York*, 50 F. Supp. 3d 426, 435 (S.D.N.Y. 2014) (citations omitted).

Under New York law, even when probable cause is present at the time of arrest, evidence might later surface that would eliminate that probable cause. *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996).  "[F]or probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Id.*  However, when

"a court finds there was probable cause for an arrest, and in the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie." *Jimenez* v. *City of New Rochelle*, No. 19 Civ. 2525 (VB), 2021 WL 1178090, at *8 (S.D.N.Y. Mar. 29, 2021) (quoting *Rodriguez* v. *City of New York*, No. 08 Civ. 4173 (RRM), 2012 WL 1059415, at *11 (E.D.N.Y. Mar. 28, 2012) (internal quotations omitted)).

"A law enforcement officer is entitled to qualified immunity in a suit for malicious prosecution if he can establish that he had at least arguable probable cause to charge the plaintiff." *Tucker* v. *Decker*, 683 F. App'x 20, 22 (2d Cir. 2017) (summary order). *See supra* B.2.b.

      **b.    Analysis**

Plaintiff's malicious prosecution claim applies, if at all, only to Officer John, who was the deponent on the criminal complaint. The malicious prosecution offense requires a defendant's personal involvement in the initiation of a proceeding. *See, e.g., Cruz*, 232 F. Supp. 3d at 452; *Warheit*, 271 F. App'x at 126. Courts have found that a defendant initiates a proceeding when he "play[s] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman*, 215 F.3d at 215 (quoting *DeFilippo* v. *County of Nassau*, 583 N.Y.S.2d 283, 284 (2d Dep't 1992), and citing *Present* v. *Avon Prods., Inc.*, 687 N.Y.S.2d 330, 335 (1st Dep't 1999)). A claim for malicious prosecution against a police officer "requires

some showing that the defendant distorted the process by which [the] plaintiff was brought to trial." *Bailey* v. *City of New York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (citation omitted).

There is no dispute as to the first, fourth, and fifth elements of Plaintiff's malicious prosecution claim: Officer John commenced or continued a criminal proceeding against Plaintiff (*see* Crim. Compl.); the proceeding was terminated in Plaintiff's favor (*see* Def. 56.1 Reply ¶ 53); and Defendant was held in jail until his arraignment later that morning (*see id.* at ¶¶ 45, 50). However, the parties dispute the second and third elements: probable cause and malice. (*See* Pl. Opp. 19).

Plaintiff argues that Officer John's allegedly false statement in the criminal complaint — "I observed the defendant shove me multiple times" — evidences both the lack of probable cause and John's malice in bringing about Plaintiff's prosecution. (Pl. Opp. 18-21).[21] The Court need not dwell on any inaccuracy in Officer John's sworn statement, however, because the Court has already concluded that the Officers had probable cause to arrest Plaintiff, and

---

[21]    In his deposition testimony, Officer John admitted that although he felt that he was being pushed when trying to arrest Ms. Rosario (John Dep. 81:5-6), and that when he turned around he saw Plaintiff standing shoulder to shoulder with him (*id.* at 69:8-16), he did not actually "observe" Plaintiff shoving him multiple times, but rather surmised that conduct from the surrounding circumstances (*id.* at 82:4-7). However, as Defendants note (Def. Reply 8), courts in this Circuit have found that "even where plaintiff alleges … that the malicious prosecution is based on fabricated evidence, 'the existence of probable cause independent of the fabricated evidence is a defense to that claim.' 'To hold otherwise would untether the malicious prosecution claim from its Fourth Amendment roots.'" *Hoyos* v. *City of New York*, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) (quoting *Morse* v. *Spitzer*, No. 07 Civ. 4793 (CBA) (RML), 2012 WL 3202963, at *4-5 (E.D.N.Y. Aug. 3, 2012)), *aff'd*, 650 F. App'x 801 (2d Cir. 2016) (summary order).

"probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino*, 331 F.3d at 72; *accord Kee* v. *City of New York*, 12 F.4th 150, 166 (2d Cir. 2021).  As discussed in detail above, there is clear evidence in the record that there was probable cause to arrest and initiate the prosecution against Plaintiff for OGA.  *See supra* B.2.b.  And there is no evidence that Officer John (or, indeed, any of the Officers) learned of any intervening facts between Plaintiff's arrest and the filing of the criminal complaint to undermine that probable cause.  *See Guillen* v. *City of New York*, No. 19 Civ. 5655 (JPC) (OTW), — F. Supp. 3d —, 2022 WL 4072925, at *11 (S.D.N.Y. Sept. 2, 2022) (granting summary judgment on Plaintiff's malicious prosecution claim for same reasons); *see also Lowth*, 82 F.3d at 571 (stating that, for probable cause to dissipate between arrest and prosecution, "the groundless nature of the charges must be made apparent by the discovery of some intervening fact"); *Pierre* v. *City of New York*, 531 F. Supp. 3d 620, 626 (E.D.N.Y. 2021) ("Where probable cause to arrest existed, a plaintiff must show that the defendants learned of some intervening facts undermining probable cause between arrest and initiation of the prosecution, or the claim of malicious prosecution cannot survive." (cleaned up)); *Soto* v. *City of New York*, 132 F. Supp. 3d 424, 453 (E.D.N.Y. 2015) (granting summary judgment for defendants where plaintiff produced no evidence that law enforcement officers became aware of exculpatory evidence that could undermine probable cause after arrest).

Officer John had probable cause to charge Plaintiff with OGA.  At the very least, he had arguable probable cause for the charge, which would afford

him qualified immunity for his conduct.  *See, e.g.*, *McKay* v. *City of New York*, 32 F. Supp. 3d 499, 511 (S.D.N.Y. 2014) ("Similarly, an officer is entitled to qualified immunity against a claim of malicious prosecution if the officer had arguable probable cause to arrest the plaintiff.").  Accordingly, the Court grants summary judgment to Defendants on Plaintiff's federal and state malicious prosecution claims.

### 6. The Court Grants Summary Judgment as to Plaintiff's Failure to Intervene Claim

In the SAC, Plaintiff alleges that while each Defendant officer knowingly engaged in the use of excessive force or subjected Plaintiff to an unlawful search and seizure or false charges, the other Defendant officers failed to intervene to prevent these violations of Plaintiff's rights.  (SAC ¶¶ 60-61).  It is well-settled that law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights.  *Rodriguez* v. *City of New York*, 291 F. Supp. 3d 396, 417 (S.D.N.Y. 2018) (citing *Guerrero* v. *City of New York*, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017)); *see also Sloley* v. *VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019).  An officer can be liable under Section 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene."  *Guerrero*, 2017 WL 2271467, at *3.

It is equally well-settled, however, that "a plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying

constitutional violation." *Kayo*, 531 F. Supp. 3d at 799 (quoting *Wieder* v. *City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) (summary order) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim.")).  Because the Court has granted Defendants' motion for summary judgment as to Plaintiff's other constitutional claims, it likewise grants summary judgment on Plaintiff's dependent claim for failure to intervene.

**C.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's Remaining State Law Claims**

In addition to the federal and state civil rights claims just resolved, discussed above, Plaintiff asserts state law causes of action against the Officers for negligence (SAC ¶¶ 74-78), and against the City for *respondeat superior* (*id.* at ¶¶ 71-73).  Federal district courts have supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, such jurisdiction is discretionary, *see City of Chicago* v. *Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction" if the court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).

In deciding whether to exercise supplemental jurisdiction, a district court must balance the traditional "values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988).  Both the Second Circuit and the Supreme Court have held that, as a general rule,

"when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers* v. *Gibbs*, 383 U.S. 715, 726 (1966)); *accord Yany's Garden LLC* v. *City of New York*, No. 20-3419, 2022 WL 288071, at *3 (2d Cir. Feb. 1, 2022) (summary order) (stating generally that "if all federal claims are dismissed before trial, the state claims should be dismissed as well" (quoting *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004))).

The Court finds that exercising supplemental jurisdiction over Plaintiff's remaining claims would be inappropriate in this case, because the claims that remain involve questions of state law for which the state courts are better suited.  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for negligence and *respondeat superior*.

**D.  The Court Dismisses Plaintiff's Claims Against the John Doe Defendants**

Plaintiff names in his pleadings ten John Doe officers.  (*See* SAC ¶ 6 ("Defendants, John Does 1-10, are presently unknown police officers … whose identities are [not] yet known at this time.")).  However, Plaintiff ascribes no conduct to any of the John Doe Defendants in either the SAC or his Rule 56.1 Statement.  Indeed, to the Court's understanding, the identities of the specific officers involved in the allegedly unlawful conduct have been disclosed to Plaintiff.  In the absence of any claim by Plaintiff of personal involvement by any of the John Doe Defendants in the conduct alleged, the Court dismisses the claims against these Defendants without prejudice.  *See Cox* v. *Vill. of Pleasantville*, 271 F. Supp. 3d 591, 618 (S.D.N.Y. 2017) ("It is well settled that

where a plaintiff has made no attempt to amend its complaint to include the real identities of John Doe Defendants and discovery has closed, the proper course is to dismiss the John Doe Defendants without prejudice.").

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims under federal law and their state law analogues. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. The Court dismisses with prejudice all of Plaintiff's federal law claims, as well as his state law claims for false arrest, illegal search and seizure, assault and battery, malicious prosecution, and failure to intervene. The Court dismisses without prejudice Plaintiff's state law claims for negligence and *respondeat superior*, and his claims against the John Doe Defendants.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     September 27, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge